## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| **BRIAN R. CALFANO**, | |
| Plaintiff, | |
| v. | |
| | Case No.: _____ |
| **THE UNIVERSITY OF CINCINNATI**; | |
| **VALERIO FERME, IN HIS INDIVIDUAL CAPACITY**; | Judge: _____ |
| **LITTISHA BATES, IN HER INDIVIDUAL AND OFFICIAL CAPACITIES**; | **COMPLAINT** |
| **SALLY MILLER, IN HER INDIVIDUAL AND OFFICIAL CAPACITIES**; | **DEMAND FOR JURY TRIAL** |
| **JAMES MACK, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES**; | |
| **ADRIENNE LYLES, IN HER INDIVIDUAL CAPACITY**; | |
| **ROBERT (BOB) JONASON, IN HIS INDIVIDUAL CAPACITY**; | |
| **WHITNEY ALLISON FOLLINGS, IN HER INDIVIDUAL AND OFFICIAL CAPACITIES**; | |
| **AND** | |
| **JENNIFER (JENNY) WOHLFARTH, IN HER INDIVIDUAL AND OFFICIAL CAPACITIES**, | |
| Defendants. | |

1

### Introduction

1.     Dr. Brian Calfano was a tenured professor, an award-winning journalist, and the Head of the University of Cincinnati's Department of Journalism. He lost all that in retaliation for exercising his right to speak freely under the First Amendment. First, he objected when the University imposed an unauthorized, race-based hiring policy that violated its own bylaws. Second, he supported a female colleague who reported sexist conduct by a male faculty member. For these acts—both of which are protected by the Constitution and by statute—the University and its administrators systematically destroyed his career, his reputation, and nearly his life.

2.     The retaliation began when Dr. Calfano refused to quietly accept the University's demand that he undo his hiring of Meghan Goth, a highly qualified candidate he had lawfully appointed as faculty advisor to the student newspaper. Because Goth was white, Associate Dean Littisha Bates blocked Goth's appointment through an uncodified "DEI" hiring process that had never been announced, had never been approved by the Board of Trustees, and directly conflicted with bylaws granting Dr. Calfano unilateral hiring authority. When Dr. Calfano objected—raising concerns that the policy was both unauthorized and racially discriminatory—Bates told Dr. Calfano to "check himself." When Dr. Calfano supported Goth's reporting of sexist remarks made to her by faculty member Bob Jonason, the University ignored Goth's complaints entirely. Instead, it turned its enforcement machinery against Dr. Calfano.

3.     Specifically, the University launched two investigations against Dr. Calfano. The first investigation was based on a grab-bag of pretextual allegations—classroom complaints, financial issues, collegiality concerns. These allegations could have been refuted with minimal inquiry, but the truth was not the point. The point was to oust Dr. Calfano by any means necessary. The second investigation was a Title IX sexual harassment investigation. The Title IX investigation was not initiated by any individual complaints, as is typical in Title IX investigations. Instead, the Title IX Coordinator initiated the investigation on behalf of the University *itself*, based on conduct that even the University's own outside hearing attorney admitted was "not sexual in nature." While Dr. Calfano faced the full weight of the University's investigative apparatus, Jonason—the faculty

member actually accused of sexist conduct by Goth—faced no investigation, no discipline, and no consequences whatsoever.

4.     The campaign succeeded.  Dr. Calfano was stripped of his position as Department Head.  He was removed from his classroom.  The stress of the proceedings caused him to lose 25 pounds, attempt suicide, and be hospitalized.  His mental health deteriorated until his doctors placed him on full-time medical leave.  Ultimately, he resigned to escape an institution determined to destroy him.  But leaving the University did not end the retaliation.  Within weeks of his departure, the University released his unresolved Title IX file to a newspaper reporter—a former student of Jonason's—who published a damaging article painting the unadjudicated allegations as fact. Four days later, as a result of the article's publication, Dr. Calfano was fired from his new job as a television news anchor.  He has since found work, but his academic career is over, his broadcast journalism career is over, and his reputation has been irreparably harmed by allegations that were never tested, never adjudicated, and never resolved.

5.     This lawsuit seeks to hold the University and its administrators accountable for violating Dr. Calfano's fundamental rights, including by retaliating against him for his speech protected under the First Amendment, and retaliating against him for opposing sex discrimination in violation of Title IX.  Dr. Calfano is entitled to (a) damages for the destruction of his career, (b) an order requiring expungement of the Article 9 and Title IX investigation records from his personnel record and any similar records maintained by the University, (c) a permanent injunction against further disclosure of the allegations or investigative materials from either investigation, and (d) a declaration that his rights were violated.

## Jurisdiction and Venue

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, specifically the First and Fourteenth Amendments to the United States Constitution, enforceable through 42 U.S.C. §1983, and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district, and because Defendant University of Cincinnati is located in this District.

**PARTIES**

8.     Brian R. Calfano, Ph.D., is a citizen of the State of Texas.  But he is a former citizen of Ohio, having resided there during his tenure at the University of Cincinnati.  Dr. Calfano holds undergraduate and doctoral degrees in political science.  He has authored over 100 peer-reviewed publications on topics including politics and religion, political behavior, and politics and media.  He worked as a tenured professor at Missouri State University for eight years, an assistant professor at Chatham University, and a lecturer at Texas A&M University.  He also worked for a decade as a television news reporter, producer, and show host.  Dr. Calfano joined the University of Cincinnati faculty in August 2016 as an assistant professor of political science and journalism.  He was promoted to Associate Professor with tenure in 2019 and to full Professor in 2021.  He served as Interim Head of the Department of Journalism from 2021 to 2023 and as Head of the Department from 2023 until his removal in March 2024.

9.     Defendant University of Cincinnati ("UC" or "the University") is a public university and instrumentality of the State of Ohio.  The University receives federal funding and is subject to Title IX of the Education Amendments of 1972.

10.     Defendant Valerio Ferme was, at all times relevant to this Complaint, the Provost of the University of Cincinnati.  Ferme previously served as Dean of the College of Arts and Sciences.  He is now the President of New Mexico State University.  He is sued in his individual capacity.

11.     Defendant Littisha Bates was, at all times relevant to this Complaint, a senior administrator in the College of Arts and Sciences.  Until January 2024, Bates served as Associate Dean for Inclusive Excellence and Community Partnership, responsible for diversity-related initiatives.  Thereafter, she served as Senior Associate Dean.  She is sued in her individual and official capacities.

4

12.     Defendant Sally Miller was, at all times relevant to this Complaint, an Equal Opportunity Investigator in the University's Office of Equal Opportunity.  In that capacity, Miller served as lead investigator in the Title IX proceedings against Dr. Calfano and signed the Final Investigative Report dated September 13, 2024.  Following Defendant Lyles's departure for Stanford University, Miller assumed the role of Interim Title IX Coordinator.  In March 2025, acting in that capacity, Miller denied Dr. Calfano's request for a name-clearing hearing while reaffirming the University's position that the dismissed Title IX complaint could be refiled if Dr. Calfano ever again engaged in University programs or activities.  She is sued in her individual and official capacities.

13.     Defendant Whitney Allison Follings was, at all times relevant to this Complaint, the Director of Human Resources for the College of Arts and Sciences.  In that capacity, Follings reported directly to Defendant Littisha Bates and exercised authority over college-level hiring protocols and the receipt of discrimination complaints.  She is sued in her individual and official capacities.

14.     Defendant James Mack was, at all times relevant to this Complaint, Dean of the College of Arts and Sciences and the direct supervisor of Defendant Bates.  He is sued in his individual and official capacities.

15.     Defendant Adrienne Lyles was, at all times relevant to this Complaint, the University's Title IX Coordinator.  She is now the Title IX Coordinator at Stanford University.  She is sued in her individual capacity.

16.     Defendant Robert (Bob) Jonason was, at all times relevant to this Complaint, a faculty member in the Journalism Department, and a subordinate of Dr. Calfano's until March 2024.  Jonason also served as business manager for The News Record, the student newspaper.  He is sued in his individual capacity.

17.     Defendant Jennifer (Jenny) Wohlfarth was, at all times relevant to this Complaint, a faculty member in the journalism department.  She is sued in her individual and official capacities.

## Factual Allegations

**I.    Dr. Calfano was a distinguished professor and department head at the University of Cincinnati.**

18.    Dr. Calfano has enjoyed a distinguished career in academia and the private sector.

19.    Dr. Calfano holds a doctorate in political science.  He has authored over 100 peer-reviewed publications.  For eight years, he served as a tenured professor at Missouri State University.  And for a decade, he worked as a TV news reporter, producer, and show host.

20.    Dr. Calfano joined the University of Cincinnati's faculty in August 2016.  Over the following years, he was a productive scholar, effective teacher, and capable administrator.

21.    At the University, Dr. Calfano rose through the ranks, achieving tenure in 2019 and becoming a full professor in 2021, while serving as president of the College of Arts and Sciences Faculty Senate along the way.

22.    In 2021, Dr. Calfano was appointed Interim Head of the Department of Journalism, and, in 2023, he was appointed Department Head.

**II.    Dr. Calfano appoints Meghan Goth to serve as faculty advisor to The News Record.**

23.    Under Department and College bylaws approved by the University of Cincinnati's Board of Trustees in 2017, the Department Head possessed unilateral authority to appoint and contract for certain instructional and professional services positions, including the position of faculty advisor to The News Record, the University's student-run newspaper.

24.    The University never revoked, amended, or invalidated the Department Head's unilateral authority addressed in the preceding paragraph.

25.    In February 2023, Dr. Calfano exercised his unilateral authority under the bylaws to appoint Meghan Goth to serve as faculty advisor to The News Record.

26.    Goth was an exceptionally qualified candidate.  At the time of her appointment, she had worked for roughly fifteen years as a news manager at local news outlets in greater Cincinnati across multiple platforms, including newspaper, digital, and television.  She held a master's degree in

journalism from Columbia University, which is among the most prestigious journalism programs in the country. She was also an alumna of the University of Cincinnati's journalism department.

27.     As relevant here, Dr. Calfano's appointment of Goth required that she be hired in a staff-support position. It also required her to work alongside Defendant Bob Jonason, a professor in the Journalism Department who served as business manager for The News Record.

### III.   Goth endures Jonason's sexism after her appointment, and Dr. Calfano encourages Goth to report Jonason.

28.     After Dr. Calfano appointed Goth, Goth contacted Defendant Jonason to clarify the scope of their respective responsibilities. Dr. Calfano would soon learn from Goth that, during a July 2023 telephone call, Defendant Jonason asked about Goth's compensation. Jonason, upon learning that Goth's requested compensation of $18,000 exceeded his $15,000 stipend for his work as business manager of The News Record, became extremely agitated and engaged in a verbal tirade that included sexist remarks.

29.     During this tirade, Jonason strongly implied that, as a woman, Goth was not worth her requested compensation.

30.     After Goth reported this incident to Dr. Calfano, Dr. Calfano advised her to contact the College of Arts and Sciences' human resources office ("College HR"). That office was under the directorship of Defendant Whitney Follings and overseen by Defendant Littisha Bates, who, at the time, served as Associate Dean for Inclusive Excellence and Community Partnerships.

31.     Goth repeatedly attempted to obtain assistance from Defendant Follings over several months, leaving multiple messages, and explaining that Dr. Calfano had encouraged her to reach out. Follings, who directly reported to Defendant Bates, never responded to any of Goth's complaints.

32.     Upon information and belief, Defendant Bates was aware of Goth's complaints about Jonason but directed Follings to ignore them.

33.     Bates and others at the University were also aware that Dr. Calfano was supporting Goth's complaints of sex discrimination against Jonason. In the summer and fall of 2023, Dr.

Calfano supported Goth's claims while communicating with College HR about processing Goth's hiring paperwork.

**IV.    Defendants impose DEI hiring requirement to block Goth's appointment.**

34.    The reason Goth's complaints fell on deaf ears is perhaps because several University employees did not feel she should have been appointed in the first place.

35.    Goth is white.  That was a problem for some in the College, who believed the job should not have been given to a white person, or at least that a non-white person should have received preferential consideration.

36.    Jonason took advantage of this sentiment in objecting to Goth's hire with College HR, and he found a ready audience in Defendant Bates, who had long pushed a racialized agenda at the University.  In 2019, for example, when Bates was serving as a faculty member on the committee responsible for approving course certificates,  Dr. Calfano sought the committee's approval for a course certificate in political reporting.  During their meeting, Bates declared emphatically that the proposed curriculum needed to include components focusing on race and the experience of African Americans, specifically.  Dr. Calfano pushed back, explaining that such race-based additions were not germane to the certificate's training objectives.  But Dr. Calfano relented after Bates made clear she could—and would—ensure the committee vetoed the certificate proposal if Dr. Calfano did not add the race-centric content.  Believing that no certificate was worse than having a certificate with these additions, Dr. Calfano relented and adopted the curricular changes.

37.    After Defendant Jonason approached Bates about Goth, Bates objected to Goth's appointment and insisted on subjecting Goth's hiring to a new DEI-hiring requirement—one that gave preferences to hiring applicants who were racial minorities.  Bates conveyed her objection through University HR Director Scott Page, who reported directly to Defendant Ferme.

38.    In mid-August 2023—less than two weeks before the fall semester—Defendant Follings informed Dr. Calfano that Goth's employment application would be subject to this newly-asserted DEI hiring requirement.

39.    Dr. Calfano objected to the imposition of the DEI requirement on multiple grounds. First and foremost, Dr. Calfano objected that the requirement hindered his ability to hire the most qualified individual for the job, Meghan Goth, just because she is white. On top of that, Dr. Calfano complained that the requirement conflicted with his Board-approved unilateral appointment authority and had never before been introduced or explained by College HR or the University.

40.    In addition to sharing these concerns with College HR, including Defendants Bates and Follings, Dr. Calfano also shared them with the College's Dean, James Mack. Dr. Calfano warned them that he might file a grievance under the university-faculty collective-bargaining agreement if forced to comply with the unauthorized requirement.

## V.    Dr. Calfano escalates his complaints about the DEI hiring requirement.

41.    In mid-August 2023, Dr. Calfano escalated the matter from College-level HR to University-level HR. Defendant Bates reacted angrily to Dr. Calfano's HR escalation. In a meeting held in September 2023—attended by Defendants Bates and Mack—Bates accused Dr. Calfano of being "angry" and "emotional" in his communications with the Dean's office. When Dr. Calfano responded flatly, "I'm not the one yelling," Defendant Bates told him that he needed to "check himself."

42.    Ultimately, Dr. Calfano worked with the Department of Journalism's business manager, Evajean O'Neal, to find a workaround. O'Neal informed Dr. Calfano that Goth could be paid as an independent or external contractor, thereby circumventing the DEI hiring process. This arrangement had the endorsement of University-level HR. Through this workaround, Goth was permitted to serve as an editorial advisor to The News Record, beginning in October 2023, at the same compensation level and with the same responsibilities. Nonetheless, as Dr. Calfano was later told, the workaround had "raised eyebrows" in the Dean's office.

## VI.    Defendants retaliate against Dr. Calfano by initiating baseless Article 9 disciplinary proceedings against him.

43.    Unable to prevent Goth from being hired, the Dean's office and Jonason set their sights on the person who they blamed for the result: Dr. Calfano.

44. On March 13, 2024, while Dr. Calfano was on spring break with his family in New Jersey, he received two emails from Defendant Dean Mack's office. The first contained a letter signed by Defendant Mack and copying Defendant Bates as well as representatives from the Provost's office. The letter informed Dr. Calfano of his removal as Department Head. The second email, which also copied representatives from the Provost's office, explained that, based on various allegations listed in the email, the University was initiating an investigation against Dr. Calfano pursuant to Article 9 of the Collective Bargaining Agreement ("CBA") between the University and its faculty and that the Provost's office would run the investigation.

45. Article 9 of the CBA sets forth disciplinary standards and investigation procedures for alleged violations of the CBA or of the "University's rules, policies or standards of professional conduct." (Ex. 1, CBA Section 9.1.)

46. Dr. Calfano was simultaneously removed from teaching a media course, called, "Media Bureau," that he had been teaching that semester.

47. The Article 9 allegations fashioned a hodgepodge of disparate, purported grievances—grievances allegedly drawn from course evaluations, anecdotal complaints, workplace disagreements, speculative financial issues, and donor-fund account matters—into a single narrative of alleged misconduct.

48. The allegations were demonstrably baseless and could have been refuted through even minimal inquiry—inquiry the University deliberately chose not to undertake before stripping Dr. Calfano of his positions. The central conflict-of-interest allegation—that Dr. Calfano had outside employment interfering with his teaching duties—was flatly false: Dr. Calfano had resigned from his part-time television reporter position (the position that formed the basis for the outside-employment allegations) on September 11, 2023, months before the supposed conflict would have begun.

49. Dr. Calfano's allegedly troubling absences from a co-taught honors seminar were due to legitimate University work that the College itself had publicly promoted, including planning a

major event featuring a prominent journalist, launching the Department's award-winning documentary unit, and outfitting the Department's first television studio.

50.    The allegation that Dr. Calfano mismanaged donor funds was equally pretextual: under the University's own administrative structure, scholarship funds are managed by the UC Foundation and college business personnel, not by department heads, who lack both training in and access to the relevant financial systems.  The University accused Dr. Calfano of failing to oversee funds he had no authority or ability to oversee.

51.    The procedural irregularities surrounding the Article 9 action further confirmed its retaliatory purpose.  Article 9.1 of the CBA generally calls for "progressive discipline" and informal resolution before the initiation of formal proceedings.  (Ex. 1, CBA Section 9.1.) The University pursued neither option.

52.    Before initiating the Article 9 proceeding, the University had *never contacted* Dr. Calfano to discuss the allegations, nor did it offer him an opportunity to explain easily verifiable facts.

53.    Instead, the University compiled a hodgepodge of student complaints—from as few as one to three students per course—into a sweeping indictment using deliberately vague language such as "may be considered," "appears to be," and "it is unclear."  The Article 9 preliminary findings invoked fraud and misappropriation policies without identifying any concrete rule violations, specific dates, or enforceable standards.

54.    The CBA also requires the Dean to communicate his or her decision to remove a Department Head "to the Faculty of the Academic Unit involved … *prior to* formal removal."  (Ex. 2, CBA Section 31.4 (emphasis added).)  But neither the Dean nor anyone else involved in the decision to remove Dr. Calfano informed the journalism faculty before doing so.  The Dean's office only communicated the removal decision to the faculty *after* removing Dr. Calano.

55.    This was not a good-faith disciplinary proceeding; it was an administrative weapon deployed in retaliation for Dr. Calfano's opposition to the DEI mandate and his support for Meghan Goth.

11

56. At a later faculty meeting to discuss Dr. Calfano's removal as Department Head (after it had already happened), several individuals acknowledged their role in initiating the Article 9 investigation against Dr. Calfano.

57. Defendants Bob Jonason and Jenny Wohlfarth admitted that they had complained about Dr. Calfano to Defendant Bates. On information and belief, Bates solicited those complaints from Jonason and Wohlfarth because of Dr. Calfano's support for Goth in the face of the DEI requirement and Jonason's sexist conduct.

58. At the same meeting, for example, Wohlfarth stated that someone from the Dean's office had recently reached out to her to get her views on Dr. Calfano's leadership. And Bates admitted at the faculty meeting that she had personally asked the Provost's office, led by Defendant Valerio Ferme, to approve initiating the Article 9 proceedings against Dr. Calfano. Notably, neither Bates nor anyone else in the Dean's office consulted full-time faculty members Leonard Penix, Jeff Blevins, Sean Hughes, or Alfred Cotton before removing Calfano. On information and belief, the Dean's office did not consult them based on a belief that they would likely support Dr. Calfano.

**VII. Dr. Calfano suffers a mental health crisis.**

59. The University's retaliatory Article 9 proceedings caused Dr. Calfano to suffer a severe mental-health crisis that would eventually cause him to lose 25 pounds and attempt suicide. On April 5, 2024, about two weeks after the proceedings began, Dr. Calfano was admitted to an inpatient mental health facility.

60. When he was discharged two days later, his doctors submitted paperwork recommending that he take partial FMLA leave, and, as a result, the Article 9 process was paused.

**VIII. The University continues to pursue Dr. Calfano by starting a baseless Title IX investigation against him.**

61. Dr. Calfano's reprieve from persecution was short lived. On information and belief, just seven days after the University had removed Dr. Calfano as Head of the Journalism Department and from teaching a media course, the University coached certain students to falsely allege that Dr. Calfano had sexually harassed them.

12

62. Specifically, after Dr. Calfano was removed as Department Head, Defendant Wohl-farth—one of the same faculty members that had complained about Dr. Calfano in connection with the Article 9 complaint—had a discussion with certain students who would later accuse Dr. Calfano of sexual harassment. Following that discussion, the students approached journalism professor Leonard Penix, alleging that Dr. Calfano had sexually harassed them.

63. Penix would later recall that the students sounded as if they had spoken with someone before coming to him to figure out what they were going to say and how they should report the allegations. After discussing the allegations against Dr. Calfano, Penix directed the students to Interim Department Head Jeff Blevins, who then discussed the allegations with Defendant Bates. Bates told Blevins to immediately report the allegations to the Title IX office, which Blevins did. Later, Bates emailed the Title IX office to ensure Blevins had followed through.

64. Notably, none of these students ever filed a formal complaint against Dr. Calfano. Indeed, *no* individual complainant ever filed a Title IX complaint against Dr. Calfano. Instead, on April 29, 2024, in a striking deviation from general Title IX practice, the University's *Title IX Coordinator*—in the absence of any individual complainants—initiated the Title IX investigation against Dr. Calfano.

65. The University's treatment of Dr. Calfano was in stark contrast to the way the University handled Goth's reporting of Jonason's sexual harassment. In fact, just days before the University filed its Title IX complaint against Dr. Calfano, Goth again reported Jonason, who was still fuming at her hiring and higher compensation. Jonason had continued to engage in hostile conduct towards her, such as by locking her out of The News Record's offices on a near weekly basis. This time, Goth, with the assistance of Jeff Blevins, complained directly to the University's Title IX office. But, yet again, the University took no action against Jonason.

66. The Title IX complaint against Dr. Calfano was legally insufficient on its face and can only be understood as a retaliatory weapon disguised as civil-rights enforcement. The so-called "evidence" against Dr. Calfano consisted of *pedagogical choices* inherent to broadcast journalism instruction: asking his students in a practice-based course to share cell phone numbers (standard

newsroom practice for coordinating on-deadline production), creating group chats with students who volunteered as on-air anchors, discussing professional appearance standards for television broadcasting, and briefly adjusting a lapel microphone on a student during taping—all activities that occur routinely in broadcast programs nationwide.

67.     The allegations against Dr. Calfano did not come remotely close to satisfying the University's *own* definition of "sexual harassment" under its Title IX Sexual Harassment Policy that was in effect at all relevant times.  That Policy defined sexual harassment as conduct on the basis of sex satisfying one or more of the following: (1) "[a]n employee of the University conditioning the provision of an aid, benefit, or service of the University on an individual's participation in unwelcome sexual conduct"; (2) "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education program or activity"; and (3) "[s]exual assault, dating violence, domestic violence, or stalking."  (Ex. 3, Title IX Policy.)

68.     No allegation against Dr. Calfano asserted quid pro quo conduct, sexual propositions, sexual advances, or the conditioning of academic benefits on sexual favors.  No allegation asserted physical conduct of a sexual nature, sexual assault, dating violence, domestic violence, or stalking.  No allegation asserted conduct that was severe, pervasive, and objectively offensive as defined by the Policy.  By the University's own definitional framework, there was simply no basis to classify the allegations against Dr. Calfano as "sexual harassment"—a fact that further confirms the investigation was initiated not to enforce Title IX, but to retaliate against Dr. Calfano.

69.     As noted above, although Defendant Lyles signed the formal complaint against Dr. Calfano, neither she, nor any student, nor any other individual was identified as a complainant. The University's own investigative report acknowledged that "Dr. Lyles is not the Complainant in this matter, there is currently no named Complainant in this matter."

70.     This extraordinary procedure—a Title IX investigation launched by the Coordinator without a complainant—was permitted by the University's Title IX policy only in cases where the

Title IX Coordinator viewed the accused as "threatening the safety of the University community." (Ex. 4, Title IX Policy.)

71.     The University's own actions, however, belie any notion that they viewed Calfano as "threatening the safety of the University community." (*Id.*)

72.     Dr. Calfano was not barred from campus. He was not restricted from contacting students. He was not suspended or placed on administrative leave. In fact, *while both the Article 9 and the Title IX investigations remained pending*, the University assigned Dr. Calfano to teach the very *same* course in the fall semester that it had barred him from teaching in the spring after initiating the Article 9 investigation. And this time, the class was comprised entirely of women—the very population he supposedly harassed.

73.     Remarkably, one of the students whose allegations the Coordinator claimed to base the Title IX complaint on later admitted that "there were professors working to get [Dr. Calfano] out of [the University]." When pressed for clarification about whether "there was a concerted effort to get him out," the student responded, "Yes, that's what I heard."

## IX.     The University acted with retaliatory intent

74.     Despite the University's bad faith in initiating the Title IX investigation, Dr. Calfano fully cooperated with the investigation. Over the course of the investigation, Dr. Calfano provided extensive rebuttal and exculpatory documentation that should have resulted in a dismissal of the complaint on the merits without further proceedings.

75.     Yet as the Title IX investigation ground forward through the summer and fall of 2024, every procedural turn reinforced the fact that the process was designed to force Dr. Calfano out, not to adjudicate the truth of the allegations against him.

76.     On September 13, 2024, the Office of Equal Opportunity issued its Final Investigative Report. The document was so devoid of any conduct typically characterized as sexual harassment that even the outside attorney hired to conduct the anticipated Title IX hearing noted the "lack of sexual content."

77.     The University pressed forward, regardless.  When Dr. Calfano received the Final Investigative Report, investigator Sally Miller suggested he contact Title IX Coordinator, Defendant Lyles, to explore informal resolution.  Dr. Calfano did so, only to be told by Lyles that informal resolutions were not available for faculty under the Title IX policy.

78.      When Dr. Calfano commenced partial FMLA leave in April 2024 following his hospitalization, the University, through faculty union counsel, agreed to pause the Article 9 proceedings, reasoning that Dr. Calfano could not meaningfully participate while on medical leave.  The University did not request, accept, or review the detailed rebuttal materials Dr. Calfano had prepared.  Yet during that same partial FMLA period, the University took the *opposite* position with respect to the Title IX investigation: it insisted the investigation would continue and that Dr. Calfano *was* capable of participating.

79.     The fall of 2024 brought further evidence that the University's true aim was to make Dr. Calfano's continued employment untenable.  As noted above, despite the ongoing Title IX investigation, despite claiming that Dr. Calfano was "threatening the safety of the University community" and despite having removed him from teaching a media course in the spring after filing an Article 9 complaint against him, the University assigned him to teach the same media course in the fall semester with an all-female student roster.

80.     By late October 2024, Dr. Calfano's mental health had deteriorated to the point that his doctors advised him to transition from partial to full-time continuous FMLA leave.  The toll of the preceding months—the sudden removal from his department headship, the hospitalization and suicide attempt in April, the relentless Title IX process, the knowledge that colleagues he had trusted had orchestrated his destruction—had become unbearable.

81.     With the institutional machinery arrayed against him, Dr. Calfano felt it impossible to continue working at the University.  So, beginning on October 28, 2024, Dr. Calfano took FMLA leave once again, expecting to return to UC in mid-January 2025.

82.     During this period, one opportunity emerged that offered Dr. Calfano a fresh start. Since 2018, he had worked with an agent exploring the possibility of transitioning to full-time

television news.  In the fall of 2024, a potential opportunity arose for Dr. Calfano to work as a nighttime news anchor covering state politics for Fox 43, a television station in Topeka, Kansas.

83.     Dr. Calfano sought permission to take the job starting in the spring of 2025 and to teach his class at the University that semester remotely.  Beside the benefits entailed in teaching students while working as a practicing journalist in real time, teaching remotely would have virtually guaranteed that Dr. Calfano could not physically harass—or, more relevant here, be falsely accused of harassing—any student.  Nonetheless, Defendants Bates and Mack denied Dr. Calfano's request, even while the University's Title IX proceedings continued to describe him as "threatening the safety" of the University community.

84.     As a result, on January 5, 2025, Dr. Calfano resigned from the University, ending his nearly nine-year tenure there.  Four days later, on January 9, 2025, Title IX Coordinator Adrienne Lyles dismissed the Title IX complaint—not on the merits, not with a finding of no responsibility, but without prejudice. That is, she expressly reserved the University's right to refile the allegations if Dr. Calfano ever again engaged in University programs or activities.  The allegations would never be adjudicated, and the cloud of unresolved accusations would follow him indefinitely.

**X.     Dr. Calfano's career and reputation are permanently damaged.**

85.     Dr. Calfano's resignation did not bring him the relief he had hoped for.

86.     He began his position as a nighttime news anchor at Fox 43 in Kansas, covering state politics in the Topeka market.

87.     On January 24, 2025, the Cincinnati Enquirer published an article titled "Ex-head of University of Cincinnati journalism quits amid sexual harassment inquiry." The article, written by reporter Quinlan Bentley, painted Dr. Calfano in a highly damaging light, discussing the unresolved and unadjudicated Title IX allegations.  The article reported that Dr. Calfano had "resigned this month amid an internal investigation into claims that he sexually harassed students in his class," recounting allegations of "inappropriate comments," "late-night texts," and conduct that made students "feel uncomfortable."

88.     Although the University has denied leaking the story to the reporter, circumstances strongly suggest that it was part of the coordinated campaign by University employees to destroy Dr. Calfano. The article's author, Quinlan Bentley, was a graduate of the University of Cincinnati's journalism program and had a strong relationship with both Defendants Jonason and Wohlfarth during his time as a student. On information and belief, shortly before the article's publication, Bentley contacted Jonason and Wohlfarth to alert them that the article's publication was imminent.

89.     The Enquirer first requested Dr. Calfano's personnel file on August 30, 2024, while Dr. Calfano was still a University employee and while the Title IX investigation was ongoing, indicating that someone at the University tipped off the newspaper that there was a story about Dr. Calfano worth pursuing. And it was about two weeks after Dr. Calfano's resignation from the University that the Enquirer published its story about the Title IX allegations; the timing is yet more evidence that one or more individuals at the University tipped off the Enquirer about his situation in further retaliation for Calfano exercising his constitutional and statutory rights.

90.     If all that was not bad enough, Dr. Calfano's enemies at the University ensured Dr. Calfano's new employer would see the Enquirer article as soon as it was published. Within *minutes* of the article being published, someone sent the article to Dr. Calfano's bosses at Fox 43, as well as the entire newsroom. On information and belief, one or more University officials or employees sent the article to Dr. Calfano's new employer to further decimate Dr. Calfano's reputation and career.

91.     The consequences of the article's publication were immediate and devastating. Four days after the article's publication, on January 28, 2025, Dr. Calfano was fired from his position at Fox 43. The job that had offered him a path forward was gone, destroyed by the public dissemination of allegations that had never been tested, adjudicated, or resolved.

92.     Dr. Calfano has since found work as a Scholar-in-Residence at Iatakoo, a media technology company with which he had developed a professional relationship during his time building the University's journalism program. It is a position that draws on his expertise, but it is not the career he built over twenty years in academia, nor is it the broadcast journalism career he hoped to pursue after leaving the University. Both of those paths are now closed to him. The stigma of unresolved

sexual harassment allegations, amplified by a newspaper article that presented them as fact, has effectively rendered Dr. Calfano unemployable in the two fields to which he devoted his professional life.

## Causes of Action

### Count I – Retaliation in Violation of the First Amendment (42 U.S.C. § 1983)

*(Against Defendants Ferme, Lyles, and Jonason in their individual capacities, and against Bates, Mack, Miller, Follings, and Wohlfarth in their individual and official capacities)*

93.     Dr. Calfano incorporates by reference all preceding allegations as if fully set forth herein

94.     The First Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, prohibits government officials from retaliating against individuals for exercising their rights to free speech.

95.     42 U.S.C. § 1983 provides a cause of action against any person who, under color of state law, deprives another of rights secured by the Constitution

96.     At all relevant times, Defendants Ferme, Bates, Mack, Lyles, Miller, Jonason, Follings and Wohlfarth acted under color of state law in their capacities as employees and officials of the University of Cincinnati, a public university and instrumentality of the State of Ohio.

97.     Dr. Calfano engaged in activity protected by the First Amendment when he (a) objected to the morality and legality of the University's DEI hiring policies; (b) objected to the selective and arbitrary application of DEI mandates; (c) objected to what he regarded as the University's interfering with his responsibility, as Department Head, to hire faculty according to bylaws; and (d) escalated his governance concerns to University's human-resources department. These are all topics of legitimate interest to the public, including the taxpayers who fund public higher education.

98.     Dr. Calfano's objections addressed matters of significant public concern, including: (a) the morality and legality of DEI-hiring policies; (b) whether public universities may coerce faculty compliance with ideologically driven mandates; (c) the proper scope of academic freedom in faculty hiring decisions; (d) whether university administrators may override faculty authority granted by

Board-approved bylaws; and (e) whether public universities may impose hiring policies that have not been authorized through proper governance channels.

99.     Dr. Calfano's objections were made on his own initiative to those outside his chain of command, including University HR, and addressed governance irregularities beyond his day-to-day job responsibilities. Regardless, his speech was protected because he retained First Amendment rights for speech relating to teaching and academic governance, including speech pertaining to the morality and legality of DEI policies. *See Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021).

100.    No University interests outweighed Dr. Calfano's free-speech interests. Neither the University nor its officials have any legitimate interest in retaliating against employees for engaging in protected speech, including the speech in which Dr. Calfano was engaged. Nor did Dr. Calfano's speech disrupt or threaten to disrupt the efficient operation of the University.

101.    The Defendants named in this Count each took one or more adverse actions against Dr. Calfano that were motivated by his protected speech, as set forth in the preceding paragraphs.

102.    Defendants Jonason and Wohlfarth provided false and misleading complaints about Dr. Calfano to Defendant Bates in late February and early March 2024—complaints that, at least in Wohlfarth's case, were solicited by the Dean's office—furnishing the pretextual material that the University would use to initiate Article 9 and Title IX proceedings against Dr. Calfano. At a unit faculty meeting held after Dr. Calfano's removal, Jonason admitted that he was the source of the Article 9 complaints, and Wohlfarth admitted that she had complained to Bates about Dr. Calfano and the unit's "culture." On information and belief, Defendant Wohlfarth also discussed the students' Title IX-related concerns with those students before those students approached the Interim Department Head with their allegations, yet did not report those concerns as required by University policy—instead coordinating with Defendant Bates and others to encourage the students to bring allegations against Dr. Calfano. On information and belief, Defendant Jonason further facilitated the retaliation by informing a journalist with whom he had a personal relationship about the Title IX investigation. On information and belief, this tip and Jonason's encouragement led the author to make a public-records request through which he gained information that led to

publication of the January 2025 Cincinnati Enquirer article addressing Dr. Calfano's unresolved Title IX allegations, as described in the factual allegations above.

103.    Defendant Bates orchestrated the retaliatory campaign from within the Dean's office. Bates solicited and received the complaints from Jonason and Wohlfarth, and sought and obtained approval from Defendant Ferme's office—the University Provost's office—for initiating the Article 9 action.  Coordinating with Defendant Mack, Defendant Bates also sought and obtained the approval of Matt Serra, Vice Provost, to remove Dr. Calfano as Head of the Journalism Department without first informing the Journalism faculty, in violation of the CBA.  Bates was also copied on the Article 9 letter that removed Dr. Calfano.

104.    When students subsequently approached the Interim Department Head, Jeff Blevins, with Title IX-related concerns, Bates directed Blevins to immediately report the allegations to the Title IX office and then personally contacted the Title IX office to ensure he had done so.  Bates thus served as the driving force behind both the Article 9 and Title IX proceedings against Dr. Calfano.

105.    Defendant Mack, as Dean of the College of Arts and Sciences and Bates's direct supervisor, signed the Article 9 letter and formally approved of removing Dr. Calfano as Department Head and from his media course assignment on March 13, 2024.  Mack had the authority to prevent the retaliatory action; instead, he facilitated it in retaliation for Dr. Calfano's protected speech, including his speech at a meeting in September 2023 that included Dr. Calfano, Defendant Bates, and Defendant Mack.

106.    Defendant Ferme, as Provost of the University of Cincinnati, authorized the Article 9 action that Bates brought to his office for approval.  Bates publicly acknowledged at the post-removal faculty meeting that the Provost's office had approved Dr. Calfano's removal.  Ferme was also directly copied on the Title IX complaint and commencement transmittal chain on April 29–30, 2024.  Additionally, a representative in Ferme's office communicated the decision to pause the Article 9 process during Dr. Calfano's FMLA leave, only for the University to initiate the Title IX investigation, on allegations that were at least as spurious, ten days later.

107.    Defendant Lyles, the University's Title IX Coordinator, personally signed the formal Title IX complaint against Dr. Calfano on April 29, 2024, and initiated the investigation despite the absence of any individual complainant—an extraordinary step permitted under the University's policy only when the Title IX Coordinator deems the respondent as "threatening the safety" of the university community.  The University's own subsequent actions belied any such determination. Lyles further refused to pause the Title IX investigation during Dr. Calfano's partial FMLA leave, even as the Provost's office had paused the Article 9 proceedings on that same basis.

108.    Defendant Miller conducted the Title IX investigation and co-authored the final investigative report.  The investigation proceeded over Dr. Calfano's objections during his partial FMLA leave and resulted in a report that was ultimately released to the Cincinnati Enquirer without adjudication or resolution—forming the basis for the article that destroyed Dr. Calfano's broadcast journalism career.

109.    Defendant Follings, as Director of Human Resources for the College of Arts and Sciences, imposed the previously unannounced DEI hiring requirement on Dr. Calfano in mid-August 2023, obstructing the hiring of Meghan Goth.  Despite Goth's repeated attempts to report Defendant Jonason's sexist conduct to Follings's office in summer 2023, Follings never responded to any of Goth's messages, effectively ensuring that the Title IX concerns about Jonason went unaddressed.  Follings reported directly to Defendant Bates, and the HR freeze on Goth's onboarding—triggered by Jonason's intervention with Follings—cannot plausibly be characterized as an isolated administrative act independent of the broader retaliatory scheme.

110.    Each of these adverse actions, individually and collectively, would deter a person of ordinary firmness from continuing to engage in protected speech.

111.    The adverse actions taken against Dr. Calfano were motivated by his protected speech.

112.    As a direct and proximate result of Defendants' retaliation, Dr. Calfano has suffered: (a) loss of his position as Department Head; (b) loss of teaching responsibilities; (c) severe mental and emotional distress, including hospitalization and a suicide attempt; (d) physical manifestations of stress, including significant weight loss; (e) damage to his professional reputation; (f) loss of his

position as a television news anchor at Fox 43; (g) effective foreclosure from future employment in academia and broadcast journalism; (h) lost wages and benefits; and (i) other consequential damages.

### Count II – Title IX Retaliation

#### *(Against Defendant University of Cincinnati)*

113.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

114.    Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §1681(a).

115.    Retaliation against a person because that person has complained of sex discrimination is intentional sex discrimination encompassed by Title IX. *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 173–74 (2005). Title IX retaliation claims extend to those who oppose discrimination against others. If recipients were permitted to retaliate freely, individuals who witness discrimination would be loath to report it, and all manner of Title IX violations might go unremedied. *Id.*

116.    The University of Cincinnati receives federal funding and is subject to Title IX.

117.    Dr. Calfano engaged in protected activity under Title IX when, among other things, he: (a) supported Meghan Goth in reporting Defendant Jonason's sexist conduct; (b) continued to support Goth as she repeatedly attempted to obtain assistance from College HR Director Whitney Follings regarding Jonason's conduct; and (c) advised Goth to contact College HR and the Title IX office.

118.    The University, through its agents and employees, including Defendants Bates, Mack, and Lyles, knew that Dr. Calfano had encouraged and supported Goth's complaints about Jonason. Goth informed College HR Director Whitney Follings—who reported directly to Defendant Bates—that Dr. Calfano had encouraged her to report Jonason's conduct. The University's Title

IX office received Goth's formal complaint about Jonason on or about April 22, 2024, and was aware of Dr. Calfano's role in supporting her complaints.

119.    The University, through its agents and employees, subjected Dr. Calfano to adverse actions because he engaged in protected activity under Title IX, as set forth in the preceding paragraphs.

120.    For example, through Defendants Jonason and Wohlfarth, the University furnished the pretextual basis for both the Article 9 and Title IX proceedings against Dr. Calfano. Jonason and Wohlfarth provided false and misleading complaints about Dr. Calfano to Defendant Bates in late February and early March 2024—complaints that, at least in Wohlfarth's case, were solicited by the Dean's office.  On information and belief, Wohlfarth further advanced the University's retaliatory campaign by discussing Title IX-related concerns with certain students before those students approached the Interim Department Head, coordinating with Defendant Bates and others to encourage the students to bring allegations against Dr. Calfano rather than reporting the concerns through proper University channels.

121.    Through Defendant Bates, the University orchestrated and drove the retaliatory proceedings against Dr. Calfano.  Bates solicited complaints from Jonason and Wohlfarth, sought and obtained approval from the Provost's office for the Article 9 action, sought and obtained Dr. Calfano's removal as Head of the Journalism Department, and directed Interim Department Head Jeff Blevins to immediately report student allegations to the Title IX office—personally contacting the Title IX office to ensure he had done so.  Bates also denied Dr. Calfano's request to teach remotely in the spring of 2025, foreclosing his only viable path to continued employment at the University.

122.    Through Defendant Mack, the University formally removed Dr. Calfano as Department Head and from his media course assignment.  Mack, as Dean of the College of Arts and Sciences, signed the Article 9 letter effectuating Dr. Calfano's removal on March 13, 2024, and, together with Bates, denied Dr. Calfano's request to teach remotely.

123.    Through Defendant Ferme, the University authorized the Article 9 proceedings at the Provost level.  Ferme's office approved the initiation of the Article 9 action and transmitted the Article 9 investigation findings.  Ferme was also directly copied on the Title IX complaint and commencement transmittal chain on April 29–30, 2024, notwithstanding the fact that, at least as a formal matter, the Title IX office reported directly to the University President rather than reporting through the Provost's office.

124.    Through Defendant Lyles, the University initiated the Title IX investigation against Dr. Calfano on April 29, 2024, without any individual complainant—an extraordinary step permitted under University policy only when the Title IX Coordinator deems the respondent a threat to the safety of the university community.  Lyles refused to pause the Title IX investigation during Dr. Calfano's partial FMLA leave, even as the Provost's office had paused the Article 9 proceedings on that same basis.  And upon Dr. Calfano's resignation, Lyles exercised her discretion to dismiss the Title IX complaint without prejudice rather than on the merits, expressly reserving the University's right to re-initiate the investigation and hearing if Dr. Calfano returned to the University.

125.    Through Defendant Miller, the University conducted the Title IX investigation over Dr. Calfano's objections during his partial FMLA leave and produced the Final Investigative Report that was ultimately released to the Cincinnati Enquirer without adjudication or resolution.  Miller subsequently denied Dr. Calfano's request for a name-clearing hearing while reaffirming the University's position that the dismissed complaint could be refiled.

126.    Through Defendant Follings, the University imposed the previously unannounced DEI hiring requirement that obstructed Meghan Goth's appointment, and failed to respond to Goth's repeated complaints about Jonason's sexist conduct—ensuring that the Title IX concerns Goth raised about Jonason went unaddressed even as the University turned its investigative apparatus against Dr. Calfano.

127.    Through these agents and employees, the University released Dr. Calfano's unresolved Title IX file to the Cincinnati Enquirer, and, on information and belief, ensured that the resulting

article was sent to Dr. Calfano's new employer within minutes of its publication. The University denied Dr. Calfano any meaningful opportunity to clear his name at every stage of the proceedings.

128.    Each of these actions, individually and collectively, constitutes a materially adverse action that would dissuade a reasonable person from engaging in protected activity under Title IX.

129.    Multiple University officials who had authority to take corrective action to address the retaliation against Calfano and to institute corrective measures had actual knowledge of the retaliation but did not do so. They were worse than deliberately indifferent; they were active participants in the discrimination. These officials included (1) Defendant Mack, as Dean of the College of Arts and Sciences and direct supervisor of Defendant Bates, (2) Defendant Bates, as Associate Dean, and, later, Senior Associate Dean for Inclusive Excellence and Community Partnerships, (3) Defendant Ferme, as Provost of the University of Cincinnati, and (4) Defendant Lyles, as the University's Title IX coordinator.

130.    As a direct and proximate result of the University's retaliation, Dr. Calfano has suffered the injuries described in Count I, which are incorporated herein by reference.

### Count III – Civil Conspiracy to Deprive Constitutional Rights (28 U.S.C. §1983)

*(Against Defendants Ferme, Lyles, and Jonason in their individual capacities, and against Bates, Mack, Miller, Follings, and Wohlfarth in their individual and official capacities)*

131.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

132.    Defendants Ferme, Bates, Mack, Lyles, Miller, Jonason, Follings, and Wohlfarth entered into an agreement, understanding, or meeting of the minds to violate Dr. Calfano's constitutional rights.

133.    In furtherance of this conspiracy, Defendants took the following overt acts (among others):

134.    Defendant Bates solicited pretextual complaints from Defendants Jonason and Wohlfarth, directed Defendant Follings to impose the DEI requirement and to ignore Goth's sex-discrimination complaints, obtained approval from Defendant Ferme's office for the Article 9 action,

and coordinated with Defendant Mack to remove Dr. Calfano as Department Head without consulting the journalism faculty as the CBA required.

135.     Defendant Mack approved and signed the Article 9 letter removing Dr. Calfano as Department Head, and approved Dr. Calfano's removal from the media course.

136.     Defendant Lyles signed-off on the formal Title IX complaint against Dr. Calfano despite the absence of any individual complainant or allegations amounting to actionable sexual harassment, refused to offer Dr. Calfano an informal resolution despite seemingly having the authority to do so, and, upon Dr. Calfano's resignation, dismissed the Title IX complaint without prejudice—expressly reserving the University's right to refile if Dr. Calfano ever returned, ensuring that the cloud of unresolved allegations would follow him indefinitely.

137.     Defendant Miller furthered the conspiracy by co-authoring a Final Investigative Report devoid of sexually harassing conduct.  After Dr. Calfano resigned, Miller reaffirmed the University's position that the dismissed complaint could be refiled, thereby perpetuating the stigma that the conspiracy had created.

138.     Defendant Ferme authorized the Article 9 action that Bates brought to his office for approval, and his office was tasked with overseeing the Article 9 investigation.

139.     Defendant Jonason's complaints to Defendants Bates and Follings furnished pretextual material on which the Article 9 proceedings were based.  On information and belief, Jonason further advanced the conspiracy by tipping off Cincinnati Enquirer reporter Quinlan Bentley—a former student with whom Jonason maintained a close personal relationship—about the Title IX investigation, leading to the public-records request and the January 2025 article that destroyed Dr. Calfano's career at Fox 43.

140.     Defendant Wohlfarth, like Jonason, also provided the Dean's office pretextual material that was used to support the Article 9 action.  In addition,  on information and belief, Defendant Wohlfarth encouraged certain students to falsely allege that Dr. Calfano sexually harassed them.

141.     Defendant Follings, acting at the direction of and in coordination with Defendant Bates, imposed a previously unannounced, racially discriminatory DEI hiring requirement on Dr.

Calfano's appointment of Meghan Goth in 2023. Follings simultaneously received and ignored Goth's repeated complaints about Defendant Jonason's sexist conduct.

142. As further evidence of the above-described conspiracy, one of the students who the University quoted in its Title IX complaint against Calfano later admitted that "there were professors working to get [Dr. Calfano] out of [the University." When pressed for clarification about whether "there was a concerted effort to get him out," the student responded, "Yes, that's what I heard."

143. The conspiracy was directed at depriving Dr. Calfano of his First Amendment rights.

144. As a direct and proximate result of Defendants' conspiracy, Dr. Calfano has suffered and continues to suffer damages as described above.

### PRAYER FOR RELIEF

In light of the foregoing, Dr. Calfano demands judgments against the defendants, jointly and severally where appropriate, and seeks the following relief:

A. Actual and compensatory damages;

B. Nominal damages;

C. Punitive damages;

D. Plaintiff's attorneys' fees, costs, and disbursements;

E. Pre- and post-judgment interest;

F. Declaratory relief establishing that the defendants violated Dr. Calfano's rights under the First and Fourteenth Amendments, and under Title IX;

G. Injunctive relief against Defendants sued in their official capacities and sufficient to protect Dr. Calfano from further injury, including

    1. An order requiring the University of Cincinnati to expunge all records related to the Article 9 disciplinary proceedings and the Title IX investigation from Dr. Calfano's personnel file and any similar records maintained by the University,

including any records maintained by the Office of Equal Opportunity, the Provost's Office, and the College of Arts and Sciences Dean's Office;

2. An order requiring the University of Cincinnati to dismiss the Title IX complaint against Dr. Calfano on the merits, with prejudice;

3. An order vacating the without-prejudice dismissal of the Title IX complaint and permanently prohibiting the University from refiling or reinstating the Title IX complaint against Dr. Calfano;

4. A permanent injunction prohibiting Defendants from further disclosing the unresolved allegations or investigative materials from either the Article 9 or Title IX proceedings to any third party.

H. Any additional relief this Court deems just and proper.

February 23, 2026

Respectfully submitted,

*/s/ Shams H. Hirji*, Trial Attorney
Shams H. Hirji (0099227)
Benjamin M. Flowers (0095284)
Carol A. Thompson (0102788)
ASHBROOK BYRNE KRESGE FLOWERS LLC
PO Box 8248
Cincinnati, OH 45249
Tel: (513) 582-7424
shhirji@abkf.com
bflowers@abkf.com
cathompson@abkf.com

*Counsel for Plaintiff Brian R. Calfano*

## Jury Demand

Dr. Calfano demands a trial by jury as to all issues triable of right.

February 23, 2026                                  Respectfully submitted,

*/s/ Shams H. Hirji*, Trial Attorney
Shams H. Hirji (0099227)
Benjamin M. Flowers (0095284)
Carol A. Thompson (0102788)
Ashbrook Byrne Kresge Flowers LLC
PO Box 8248
Cincinnati, OH 45249
Tel:  (513) 582-7424
shhirji@abkf.com
bflowers@abkf.com
cathompson@abkf.com

*Counsel for Plaintiff Brian R. Calfano*

**ARTICLE 9**
**<u>DISCIPLINARY PROCEDURES</u>**

9.1     **Discipline Standards and Investigation Procedures.** The University shall not impose discipline except for adequate cause. The University subscribes to the principles of progressive discipline except when other action is necessary and appropriate.

Any disciplinary action shall be predicated upon a violation of this Agreement or of the University's rules, policies or standards of professional conduct including consistent failure to fulfill responsibilities in the Academic Unit. It is understood by the Parties that where State or Federal law requires procedures different from the provisions of this Article on matters related to employee discipline, the State or Federal law applies.  For Faculty Members involved as respondents in Title IX matters, the investigatory and disciplinary procedures will be those set forth in applicable University policy and administered by the appropriate University office. Any proposed changes to these procedures or policies affecting Faculty Members will include discussion, or when required agreement, with AAUP before implementation.

   9.1.1   **Initiation of Article 9 Investigation.** Only academic administrators at the level of Dean (or his/her Associate or Senior Associate Dean, if so delegated), other Appropriate Administrator, or above (the "Initiating Administrator") can initiate Article 9 disciplinary proceedings. However, anyone**,** including the Academic Unit Head or a Faculty Member, may provide information relevant to deciding whether an Article 9 investigation should begin.

   9.1.2   **Student Complaints.** In the event that a student has a complaint against a Faculty Member, the student should be encouraged to meet with the Faculty Member, with the Ombudsperson or with the Academic Unit Head in order to resolve the complaint. It is preferable, but not required, that the meeting be with the Faculty Member. If the student's complaint remains unresolved, the student may proceed under the Student Grievance Procedures, as established by the Board from time to time.

   However, a proceeding under this Article may be commenced for any violation of the Contract regardless of any prior or concurrent action taken under the Student Grievance Procedure concerning the same or similar issues.

**EXHIBIT**

**1**

**9.1.3** **Rights of the AAUP and Administration.** The AAUP and the Administration each have the right to have a representative present at all Article 9 proceedings. The Faculty Member may, in writing, request that the AAUP waive its right to be present at any meeting related to Article 9 proceedings, except Grievance Panel hearings.

For purposes of this subsection, "Article 9 proceedings" include any meeting relative to the Article 9 process where the Faculty Member is present, including any related investigatory meetings or proceedings conducted by offices other than the University Contract Administrator's (as permitted under Article 9.1.6.1).

**9.1.4** **Suspension Pending Investigation.** When, in the judgment of the President or Provost, the presence of a Faculty Member on University property presents a threat to the health or safety of the Faculty Member or anyone in the University community or represents a threat of substantial disruption or substantial interference with the normal and lawful activities of the University community, the President or Provost may suspend with pay the Faculty Member pending the disposition of the disciplinary process provided in this Agreement. The President or Provost may also direct that the Faculty Member be removed and barred from University property. Such suspensions shall not be invoked in an arbitrary or capricious manner, and shall end upon the conclusion of the Article 9 investigation or, if discipline is proposed, at the end of any subsequent grievance proceeding.

**9.1.5** **Investigation.** When the University has reason to believe an incident has occurred that might constitute grounds for discipline, the Initiating Administrator shall notify the Faculty Member involved by letter, with a copy to the AAUP, that a formal investigation has begun. The letter must explain the subject of the investigation, the right to consult with a representative of the AAUP, and the right to request the presence of a representative of the AAUP at any meeting with the Faculty Member.

In the event that providing this notice to the Faculty Member would compromise the investigation, such notice must be sent to the AAUP with a rationale for the need to withhold notice to the Faculty Member until the conclusion of the initial stage of the investigation.

47

### 9.1.6 Investigation

**9.1.6.1 Responsibility for Investigation.** The University Contract Administrator shall be responsible for the investigation. S/he may be assisted by other University officials at all stages of the investigation and any subsequent meetings or grievance proceedings.

**9.1.6.2 Meeting to Review Specific Charges.** Upon completion of the initial stage of the investigation, the Faculty Member and the AAUP must be provided with a written statement that includes the nature of the complaints and the names of the complainants (with the exception of current UC students whose names may be withheld until a proposal of discipline is made, if any), and the specific charges. This statement must be provided to the Faculty Member not later than two (2) days prior to a meeting between the Initiating Administrator, the University Contract Administrator, the Faculty Member, and a representative of the AAUP (unless waived per Article 9.1.3). This meeting should take place within seven (7) days of receipt of the statement and all parties should make their attendance a priority.

The Faculty Member may request a delay to this meeting, not to exceed seven (7) days, if s/he needs the additional time to prepare an adequate response to the specific charges. At this meeting, the Faculty Member shall have the opportunity to review the specific charges with the University Contract Administrator and the Initiating Administrator, and respond to the specific charges. This meeting may also provide the opportunity to resolve the complaints by mutual agreement.

**9.1.6.3 Conclusion of the Investigation.** The Initiating Administrator shall take into account the Faculty Member's responses and, if no resolution can be reached at the above-noted meeting, must close the investigation without action, or propose discipline, within forty-five (45) days after the notice letter required in Article 9.1.5 was sent, unless an extension is agreed to

48

by the AAUP. For joint investigations involving the Office of Equity, Inclusion and Community Impact, the deadline shall be ninety (90) days, and for cases involving research misconduct the deadline shall be one hundred eighty (180) days.

**9.1.7** **Authority.** The Initiating Administrator shall have the authority:

**9.1.7.1** to dismiss the charge;

**9.1.7.2** to propose a written warning to the Faculty Member;

**9.1.7.3** to propose a letter of reprimand to the Faculty Member;

**9.1.7.4** with the Dean's consent, if applicable, to propose suspension without pay for a specified period of time, provided that in no circumstance shall the suspension without pay exceed one academic semester, defined as starting the first day of class and ending the day final grades are due that same semester, inclusive of those two days and official University holidays. The continuation of benefits while on suspension without pay is upon payment by the individual of his or her portion of the costs. Payment arrangements must be made with the Benefits Division; or

**9.1.7.5** with the Dean's consent, if applicable, to propose dismissal of the Faculty Member for cause.

Where appropriate, other remedial actions may be included with the proposed disciplinary action. Disciplinary action other than that listed above may be proposed that is commensurate with the nature and gravity of the alleged action. Such proposals must indicate where the proposal would fall in the list of specified disciplinary actions described above.

**9.1.8** **Deferral to Grievance Panel.** No University official may impose any disciplinary action before the Faculty Member's right to a Grievance Panel has expired or been waived. However, where appropriate, a Faculty Member may be placed on administrative leave with pay and benefits pending the outcome of the Article 9 investigation and grievance procedures.

49

A proposal of dismissal shall have the effect of holding in abeyance any decisions related to requests for academic leave under Article 25 or requests for reappointment, promotion, and/or tenure under Article 7 during the grievance process up to and including a final arbitration decision. If the proposal of dismissal is ultimately upheld under this Agreement, such personnel decisions will be deemed null and void.

**9.2**    **Dismissal Standards.**  A Faculty Member may be dismissed only for adequate cause. Adequate cause is a reason related directly and substantially to the professional fitness of the Faculty Member under one or more of the following areas:

(a)  serious professional misconduct including, but not limited to, serious violations of this collective bargaining agreement;

(b)  misrepresentation of qualifications or credentials pertaining to employment at the University of Cincinnati;

(c)  plagiarism or other serious dishonesty related to teaching, scholarship, or professional service;

(d)  incompetence in performance that is directly related to the Faculty Member's responsibilities to the Academic Unit;

(e)  consistent inability or refusal to fulfill responsibilities to the Academic Unit;

(f)  personal conduct: (i) that represents a serious and ongoing threat to the health or safety of any person in the University community, or (ii) that manifests severe or continuing harassment or discrimination, or (iii) that otherwise substantially impairs the Faculty Member's fulfillment of responsibilities to the Academic Unit or the University;

(g)  persistent or malicious conduct that directly obstructs the performance of instructional or scholarly programs of the University.

**9.3**    **Challenge of Proposed Discipline.** If, pursuant to Article 9.1, the Initiating Administrator proposes discipline of a Faculty Member, the Faculty Member may challenge the validity of the charges, the severity of the proposed discipline, and/or allege that proper disciplinary procedures were not followed. To access the formal grievance procedure, the Faculty Member must file a Request for Grievance Panel, which includes a

request for mediation, within seven (7) days after receiving the notice of proposed discipline. See Appendix 4(A).

**9.4  Grievance Filing and Procedure for Proposed Discipline.**

**9.4.1  Filing Procedure.** To file a grievance, the Faculty Member must file a Request for Grievance Panel by contacting the office of the AAUP to obtain and to file the form. The form must state with specificity the grounds for the grievance, the specific provisions of this Agreement alleged to have been violated, and the requested relief. Failure to do so may serve as grounds for rejection of the grievance (See Appendix 4.C.1.c). Upon completion, the Grievance form will be distributed by the AAUP to the respondent(s), the Grievance Committee Co-Coordinators, and the University Contract Administrator.

**9.4.2  Position Statements.** The AAUP and the Administration discourage proliferation of grievance claims and rebuttals that are not supported by facts. The AAUP and the Administration also discourage excessive documentation. Position statements shall be no more than fifteen (15) pages in length and shall have no more than thirty (30) documents attached. Position statements must be submitted electronically.

**9.4.2.1  Administration's Position Statement.** Within twenty-one (21) days after receiving the Request for Grievance Panel form, the Administration must submit to the Grievant, the Grievance Committee Co-Coordinators, and other parties listed on the Grievance form, their position statement. The statement should detail the charges which form the basis for the proposed discipline, summarize the issues and the supporting facts, and include relevant documents or other supporting materials. In suspension or dismissal cases it should also include a list of potential witnesses to be called and identify the facts and/or incidents about which they could testify if called to do so.

In cases arising under this Article, if the Administration, or his/her designee, fails to submit a Position Statement by the deadline, the proposed discipline shall be withdrawn, the Article 9 proceedings closed, and no record of the Article 9 investigation or proceedings shall

51

appear in the Grievant's personnel file.

**9.4.2.2**      **Grievant's Position Statement.** Within twenty-one (21) days of receipt of the Administration's position statement, the Faculty Member must submit to the Administration, the Grievance Committee Co-Coordinators, and other parties listed on the Request for Grievance Panel form, their position statement. The statement should respond to each issue addressed in the Administration's position statement and should provide relevant documents and other supporting materials. In suspension or dismissal cases it should also include a list of potential witnesses to be called and identify the facts and/or incidents about which they could testify if called to do so.

In cases arising under this Article, should a Grievant fail to submit a Position Statement by the deadline, the proposed discipline shall be implemented.

**9.4.2.3**      **Rebuttals.** No later than seven (7) days after receipt of the Grievant's position statement, the Respondent may submit additional materials and documentation responding to specific issues in the Grievant's position statement. The Grievant may submit rebuttal materials within seven (7) days thereafter. No further submissions are permitted unless extraordinary circumstances exist.

**9.4.3 Composition of Panel and Conduct of Review/Hearing** See Appendix 4(B) and 4(C).

**9.4.3.1**      **Post-Hearing Rebuttal Statements.** Within seven (7) days after receipt of a copy of the recorded hearing, the Grievant and/or the Respondent may submit a rebuttal statement. The rebuttal statement shall not include evidence that was not already presented in, or prior to, the grievance hearing, except that new documentation can be included if it directly contradicts oral testimony given at the hearing. The rebuttal statement must not exceed five (5) pages. No further submissions are permitted unless extraordinary circumstances exist.

**9.5** **Severity of a Proposed Discipline.** In cases involving a proposal of discipline where the Panel finds that discipline is warranted, but the Administration's proposal is too severe, the Panel shall refer the case back to the Respondent with a request for a different proposal. The Respondent shall have seven (7) days to present a revised proposal of discipline to the Panel. The Panel may then choose to uphold the Administration's revised proposal of discipline or, if the Panel rejects the revised proposal, impose a written warning or a letter of reprimand, whichever discipline is deemed more appropriate by the Panel.

**9.6** **Records of Panel Decisions on Proposals of Discipline.** In cases involving a proposal of discipline, if the Panel finds that no discipline is warranted, no records of the grievance proceedings (including the Panel's decision) shall be placed in the Faculty Member's personnel file. If the Panel upholds the proposal of discipline, the notice of investigation, notice of suspension or administrative leave (if any), preliminary findings documentation and exhibits, response to preliminary findings (if in written format), the original proposal letter, requests for mediation and grievance panel, the Panel's decision and the final resolution of the matter shall be placed in the Faculty Member's personnel file. If the Panel's decision requires a revision, the revision shall also be included in the Personnel file. No records of the grievance proceedings other than those noted in this paragraph shall be included in a Faculty Member's personnel file; however, the University may maintain all other related records in case files that are not personnel files.

**9.7** **Arbitration of Dismissal Decisions.** No decision of a Grievance Panel with regard to a proposal of discipline may be arbitrated with the exception of a proposal of dismissal from University employment.

The decision of the Grievance Panel in a dismissal action shall be final and binding unless the Administration, the AAUP, or (if the AAUP declines to appeal to arbitration) the Faculty Member requests arbitration pursuant to Article 32 within seven (7) days after receiving notice of the Panel decision. Such a request includes notifying the other party of the decision to seek arbitration and contacting the American Arbitration Association per Article 32.3.

If the Grievance Panel upholds the proposal of dismissal and the Faculty Member does not request arbitration, the Faculty Member shall be dismissed from University employment no sooner than seven (7) days after the date of the Panel's decision.

If the Grievance Panel upholds the proposal of dismissal and the Faculty Member requests arbitration, the Faculty Member shall remain an employee of the University pending the outcome of arbitration but s/he shall be suspended without pay and without benefits, effective seven (7) days after the Grievance Panel announces its decision.

If the Grievance Panel rejects the proposal of dismissal and the Administration requests arbitration, the Faculty Member shall remain an employee of the University pending the outcome of the arbitration but she/he shall be placed on an administrative leave with pay and benefits effective immediately after the request for arbitration has been filed, pending the outcome of the arbitration.

If arbitration does not uphold the Faculty Member's dismissal, the suspension shall be lifted and the Faculty Member shall be made whole with regard to all pay, benefits, and contractually mandated salary increases lost during the period of suspension. The Faculty Member has a duty to mitigate his/her damages which will be considered by the arbitrator.

If the arbitrator determines that discipline of the Faculty Member is warranted but that dismissal is too severe, the case shall be returned to the Grievance Panel to proceed in accordance with Article 9.5.

If arbitration upholds the Faculty Member's dismissal, the Faculty Member's dismissal shall take effect as of the date of the arbitrator's ruling.

An arbitrator's decision in a case brought by the Faculty Member shall not serve as a precedent in the construction of any Article in this contract.

## ARTICLE 10
## COMPENSATION

**10.1    Across the Board Increases**

**10.1.1   2022-2023 Academic Year.** Effective September 1, 2022, each member of the Bargaining Unit who was a member of the Bargaining Unit on June 30, 2022, shall have his or her base salary increased by an amount of two percent (2.00%) of his/her base salary as of June 30, 2022.

**10.1.2   2023-2024 Academic Year.** Effective September 1, 2023, each member of the Bargaining Unit who was a member of the Bargaining Unit on June 30, 2023, shall have his or her base

Academic Unit Head must be mutually acceptable to the Dean and a majority of the Faculty of the Academic Unit.

**31.4** **Removal.** An incumbent Academic Unit Head may be removed because of inadequate administrative performance. A removal decision shall be communicated immediately by the Dean to the Faculty of the Academic Unit involved and the individual prior to formal removal.

**ARTICLE 32**
**ARBITRATION**

**32.1** In accordance with the requirements of Article 32.3, this Article shall apply to the interpretation, application, or alleged violations of any of the following provisions of the Agreement: Article 1, Recognition and Description of Bargaining Unit; Article 2, Academic Freedom; Article 4, Discrimination; Article 8, Grievance Procedures; Article 9, Disciplinary Procedures; Article 10, Compensation (except as to the distribution within colleges and library jurisdictions of any merit increases); Article 12, Minimum Salaries; Article 13, Overloads, Extra Compensation; Article 14, Academic Unit Head Compensation (only for failure to establish compensation within the ranges defined in Article 14.1); Article 15, Additional Compensation; Article 16, Medical, Dental, Life, and Disability Insurance; Article 17, Sick Leave; Article 18, Retirement Procedures and Programs; Article 21, Rights and Duties of the AAUP as Agent; Article 22, Dues Check-off; Article 23, Released Time; Article 27, Governance of the University; Section 34.2 of Article 34, Maintenance of Practices; Article, 35, Decertification; Article 36, Totality of Agreement; Article 38, Duration and Amendment.

**32.2** In accordance with the requirements of Article 32.3, this Article shall also apply to disputes as to the interpretation of the procedural requirements of the following articles: Article 5, Affirmative Action; Article 6, Appointments; Article 7, Reappointment, Promotion, and Tenure; Any section of Article 10 that prescribes Procedures for Determining Merit Increases; Article 19, Personal, Child-Rearing, Vacation, and Military Leaves; Article 24, Faculty Development Opportunities; Article 25, Academic Leave; Article 26, Professional Leave; Article 28, Retrenchment Under Conditions of Financial Exigency; Article 29, Termination Because of Discontinuation of a Program, Academic Unit, College, or Library; Article 31, Academic Unit Heads; Article 34, Maintenance of Practices.

**EXHIBIT**
**2**

**Sexual harassment:** Conduct on the basis of sex, occurring in the United States, that satisfies one or more of the following:

- An employee of the University conditioning the provision of an aid, benefit, or service of the University on an individual's participation in unwelcome sexual conduct;

- Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education program or activity; or

- Sexual assault, dating violence, domestic violence, or stalking. (See definitions for Sexual Assault, Dating Violence, Domestic Violence, and Stalking.)

**Stalking**: Engaging in a course of conduct, on the basis of sex, directed at a specific person, that (i) would cause a reasonable person to fear for the person's safety, or (ii) the safety of others; or (iii) suffer substantial emotional distress. For purposes of this definition, course of conduct means two or more acts, including, but not limited to, acts in which the respondent directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property. Reasonable person means a reasonable person under similar circumstances and with similar identities to the complainant. Substantial emotional distress means significant mental suffering or anguish that may but does not necessarily require medical or other professional treatment or counseling.

**Supportive measures:** Non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the complainant or the respondent, before or after the filing of a formal complaint or where no formal complaint has been filed. Such measures are designed to restore or preserve equal access to the University's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the University's educational environment, or deter sexual harassment.

**Third party**: A guest, visitor, program participant/attendee, vendor, contractor, subcontractor, or other person contracted to provide service or conduct business with the University.

**University community**: Employees, students, volunteers, applicants, and other third parties as defined herein.

## REPORTING

I.  **Reporting Obligations for Allegations of Conduct in Violation of this Policy**

    A. **All Individuals:** All individuals who are directly involved in, who observe, or who receive reliable information that a violation of this Policy may have occurred may report such allegations and are strongly encouraged to do so.

    B. **University Employees/University Community:** All University employees and any member of the University community who supervises faculty, staff, students, or volunteers, except those exempt from reporting as set forth in this Policy or expressly identified as a confidential reporter, have an obligation to report incidents that may be a violation of this Policy. Any such individual who receives a disclosure of allegations of conduct in violation of this Policy or becomes aware of information that would lead a

EXHIBIT

3

Supportive measures are non-disciplinary, non-punitive individualized services designed to restore or preserve equal access to the University's education program or activity, without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the University's educational environment, or deter sexual harassment. Supportive measures include, but are not limited to: counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties and/or other parties ("no contact orders"), changes in work or housing arrangements, leaves of absence, increased security and monitoring of certain areas of campus, and other similar measures.

## II.   Availability of Supportive Measures

Supportive measures are available upon receipt of a report of sexual harassment as appropriate. Individuals who would like to request supportive measures or who experience difficulty obtaining supportive measures that have been approved should contact the Title IX Coordinator.

## III.   Confidentiality of Supportive Measures

Subject to other confidentiality provisions of this Policy, the University shall maintain as confidential any supportive measures provided to the complainant or respondent, to the extent that maintaining such confidentiality would not impair the ability of the University to provide the supportive measures.

## IV.   Complying with Supportive Measures

Failure to abide by supportive measures may constitute a violation of this Policy, and/or other University policies, including the Student Code of Conduct.

## V.   Length of Supportive Measures

Supportive measures may continue to be available to complainant, respondent, and the University community following the resolution of a report or complaint.

# FORMAL COMPLAINT PROCESSING AND RESOLUTION

## I.   Formal Complaint

In order to initiate the grievance process, a complainant must file a formal complaint with the Title IX Coordinator. A formal complaint requires the complainant's physical or digital signature, or other indicia that the complainant is the person filing the formal complaint. A formal complaint may be filed in person, by mail, by electronic email, or by electronic submission. A complainant may receive supportive measures without filing a formal complaint. Formal complaints may not be filed anonymously.

The Title IX Coordinator may sign a formal complaint when concerns exist for conduct threatening the safety of the University community. The Title IX Coordinator is not a complainant or a party in the grievance process.

## II.   Where to File a Formal Complaint

EXHIBIT

4

*Primary Contact:*

Title IX Coordinator
225 Calhoun St., USquare 308
PO Box 210158
Cincinnati, OH 45221-0158
Phone: (513) 556-3349
Email: titleix@ucmail.uc.edu
Electronic Submission Form

*Deputy Title IX Coordinators on the regional campuses are available to assist with filing formal complaints:*

UC Blue Ash College
Deputy Title IX Coordinator
Muntz Hall, Room 140Q
9555 Plainfield Drive
Blue Ash, OH 45236-0086
Phone: (513) 936-1641

UC Clermont
Deputy Title IX Coordinator
Clermont Student Services, Room 140C
4200 Clermont College Drive
Batavia, OH 45103-0162
Phone: (513) 732-8964

III. **Timeframe for Filing a Formal Complaint**

Notice of conduct alleged to violate this Policy may be reported at any time. However, at the time of filing a formal complaint, a complainant must be participating in or attempting to participate in a University education program or activity. While there is no strict deadline for filing a formal complaint, and timeliness may vary according to the specific circumstances, prompt reporting is important to facilitate a thorough investigation. It is expected that reports and formal complaints about sexual harassment will be reported within a proximate time of the occurrence of the alleged conduct or the date upon which the alleged conduct became known to the reporting party. Delayed reporting or filing of a formal complaint may limit the University's ability to gather relevant evidence, to effectively address the conduct at issue, and to initiate the grievance process. Complainants and other University community members with knowledge of sexual harassment are encouraged to report to the Title IX Coordinator within 24 hours.

IV. **Presumption of Not Responsible**

Throughout the process, there is a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process. Disciplinary sanctions or other actions that are not supportive measures will be imposed against a respondent only after completion of a grievance process that complies with this Policy.

**V.**     **Equal Treatment**

Complainants and respondents shall be treated equitably throughout the grievance process.

**VI.**    **Standard of Evidence**

The standard of evidence to be used to determine responsibility for a violation of this Policy is the preponderance of the evidence.  In determining whether alleged conduct constitutes a violation of this Policy, the University will look at the totality of the circumstances, including the nature of the alleged offense as well as the location of and the context in which the alleged incident(s) occurred. The determination as to whether a particular action constitutes a violation of this Policy will be a factual determination made on a case-by-case basis, based on relevant evidence.  In the grievance process, an objective evaluation of all relevant evidence is required, including both inculpatory and exculpatory evidence.

**VII.**   **Credibility**

Credibility determinations may not be based on a person's status as a complainant, respondent, or witness.

**VIII.**  **No Conflict of Interest or Bias**

No individual designated by the University as a Title IX Coordinator, investigator, decision-maker, or any person designated by the University to facilitate the grievance process, may have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent.

**IX.**    **Timeframe to Resolve a Matter**

    **A.** **Reasonably Prompt:** Reasonably prompt timeframes for conclusion of the grievance process, including reasonably prompt timeframes for filing and resolving appeals and informal resolution processes have been established by the University.  These timeframes are estimations of the duration of time necessary to complete a reasonably prompt, thorough and appropriate grievance process.

    **B.** **Delays:** Temporary delay of the grievance process or the limited extension of timeframes for good cause, with written notice to the complainant and the respondent of the delay or extension and the reasons for the action, are permissible. Good cause may include, but is not limited to, considerations such as the absence of a party, a party's advisor, or a witness; concurrent law enforcement activity; or the need for language assistance or accommodation of disabilities.

    **C.** **Timeframes:**

        i. *Grievance Process:* The University shall make appropriate efforts to ensure that from the date of its receipt of a formal complaint, the investigation, hearing, and issuance of the adjudicating body's report shall be concluded in ninety (90) business days.

        ii. *Appeals:* Appeals are expected to be resolved within twenty (20) business days after the parties' submission of their statements.